Okay, our third case this morning is Acra Turf Club against Zanzuccki. Mr. Meyer. May it please the court, James Meyer, Frank Organsic, Sheriff Holland and Peretti for the Appellants, Plaintiffs, Acra Turf Club, LLC, and Freehold Raceway Off-Track, LLC. I have with me Kristen Boyle of the firm. I would like to reserve two minutes for rebuttal. Granted. Your Honors, the Forfeiture Amendment enacted by New Jersey in 2011 substantially impaired appellants' rights under a 2004 contract known as the Participation Agreement in violation of the Contract Clause. The Participation Agreement was a 40-year contract between the New Jersey Sports Authority and Appellants that allocates exclusive ownership and economic rights to 15 off-track, wagering facility licenses and facilities. Nine are allocated to the Authority, four to one of my clients, Freehold, and two to the other party, Acra. Each party would determine the timing and order of the application for each off-track wagering facility without the consent of any other party under the agreement. Let's assume that we were to conclude that the new timing requirement from the Forfeiture Amendment is an impairment. Let's just assume that for the purposes of this question. You say it's not a necessary avenue to achieve the state's goals, which is to get this process moving along. Correct. And you suggest in the briefs that maybe the state should have given you an incentive as opposed to a forfeiture. And so when I look at that, I look at that, you guys would prefer the carrot, not the stick. And isn't that a policy decision for the legislature to decide and not us? Not in this case, Your Honor. Why is that? In this case, the Authority is a party to the contract, meaning the state itself is a party to the contract. And under the requirements of the United States Trust v. New Jersey case and this court in the United Steel Paper case in 2016, just a year ago, the court has decided that when the state is a party to the contract, it's essentially in a conflict situation. But it's not a policy decision. I'm with you on, I'll assume again for the purposes of this question, the state is a party. And so the stricter, not strict, but stricter scrutiny applies. So we'll be on the same page for that. Correct. But still, we still have an obligation at least to be respectful of the legislature. Within constraints of the contract clause. The contract clause as written is an absolute prohibition on impairments of contract. As interpreted by the courts, you know, it gives the legislature some room to maneuver. What you're talking about, the public policy, is really the second prong of the contract, whether the state can establish that as a legitimate public interest. And assuming that they can get beyond that and that we've established substantial impairment, it's their burden, their burden under the court's analysis to demonstrate both that the impairment is both necessary and reasonable. And the courts have actually placed a specific test on what it means to be necessary. What it means to be necessary is that they didn't consider the impairing legislation on par with other options. In other words, it was placed in a special category and really is a last resort. And secondly, under the necessity analysis. What do you think they should have done then? Do you really think they should have sent out incentives? I think there are a number of things that the legislature could have done here. First of all, the legislature protected itself in the original contract by reserving to itself nine off-track wagering facility licenses and facilities. But other parties knew that. We knew the New Jersey Sports and Exposition was going to keep a majority and other participants agreed to do that. That's correct, but as to necessity, when the legislature is coming down with this piece of legislation that really only impairs my clients and the four OTWs that were left, and the justification for that is we need to hurry up, we need to accelerate, we need to get these things open. Well, the authority itself still had eight unopened OTWs. As opposed to instituting new legislation to impair the contract, it could have performed the contract. The governor directed the authority... How would it have helped your clients if the SEA had filled out all those licenses and had used them all? Excuse me? How would that have helped your clients? It seems it would have hurt them because there would have been a profusion of gambling in the state, right? Perhaps it would have hurt them from a business perspective, but it would have avoided the impairment of the contract. It would have avoided a piece of... The state is contending that it needs to accelerate the development of OTWs by impairing our contract and potentially taking our remaining four OTW license rights. But it had eight of its own that it could have opened. Instead, the governor directed the state to sell its tracts and transfer its OTWs. But another alternative would be to direct the authority to open them. We need more OTWs. You folks could have done the same thing. You guys have the same rights to the sale and lease exception. That's not entirely accurate, Your Honor. The statute doesn't... The statute is written in neutral terms, but it's really illusory. If you look at what the sale and lease exception says, it says you can avoid forfeiture of your OTW rights, right? You can avoid losing your OTW rights. But in order to avoid losing your OTW rights, you have to be entering into an agreement with another party to give up your OTW rights and your tracts to take the OTW. Well, actually, it says you have to show you're making progress. And one of the ways you do that, you could potentially do that, is through the sale and lease. And that applies to all the participants. It applies to them, but it would never be implemented. It would only be implemented in the very specific circumstance that the authority found itself into where it was under a directive from the governor to sell the tracts, and it only wanted to hold on to those OTW rights for the brief amount of time that it needed to negotiate the transfer of those OTW rights as an incentive for a purchaser to take the tract. A racetrack owner or an OTW holder that wanted to keep and hold on to its OTW rights so that it could exercise them in the future would never enter into an agreement to transfer those OTW rights in order to keep the OTW rights. Well, what was going on? I know that's not – what took everybody so long? Well, let's go back in time, right? So the Off-Tracking Account Wagering Act was passed in 2001. The participation agreement as amended was executed in 2004. In 2007, one of my clients opened up an OTW. And in 2008, another one of my clients opened an OTW. That's a full third of their collective share. And that's 10 years ago. 2003, 2009, 2010, you had the Great Recession, which really lingered in New Jersey. And in 2011, you had the Forfeiture Amendment, where the legislature said, we need to hurry up and get these things open. And all they wanted you to show was make progress. Why is that an impairment on your client's interest? To try to achieve exactly what they wanted, which is to establish facilities. It's an impairment because of what it is. I mean, the making progress requirement says that you basically have to go forth and open one of these things within a year, whether it makes business sense or not. This is a 40-year agreement. The Off-Tracking Account Wagering Act recognized – Does it say you have to open in a year? I mean, that's why the sale and lease exemption existed. Give alternatives. Show us something. Making progress toward developing one of your off-track wagering facilities within one year and then continuing to make annual progress thereafter. So you would basically – the Forfeiture Amendment, as implemented in the Racing Commission regulations, really provides a runoff, so that after the first making progress showing, then you have to come back in in a year. And for that first OTW that you came in with the making progress showing, you have to apply for the license and develop it and open it. And then the next year, you have to come in with another and another and another. Has the enforcement of the Forfeiture Amendment been suspended? Yes, it stayed by the Racing Commission. In 2014, it stayed when the Racing Commission determined that three of the four permit holders would have failed to have made progress and eight of the unopened OTWs would have been forfeited. And therefore, the Act would not have fulfilled its purpose. It would not have incented the development of OTWs. It would have resulted in the loss of OTWs. And the Racing Commission determined at that time, in Commissioner Chairwoman Klein's motion, determined that this was not in the interest of racing to have this go forward. So what we have now is we basically have an administrative stay of the impairments under the statute based on a finding that it wasn't working. Now, in the first year that the statute, the Forfeiture Amendment, was in place, you did make the necessary showing. All the parties were found to have made progress. I forget to mention to the bench I would like to reserve two minutes, which I noted to be required. So the first making progress determination was issued by the Racing Commission, but it was issued under the threat of a preliminary injunction motion that was pending at the district court. So the district court heard of arguments, the state said, give us a couple more days, we've got this making progress application that's pending, which may eliminate the argument about harm and the need for immediacy, immediate irreparable harm. And then it was answered. But if you looked at the record, there was some debate at the Racing Commission on whether the participants had really made progress. They went into executive session and they came out. They granted making progress. Now, in U.S. Trust Company, the court said that complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the state's self-interest is at stake. How is the state of New Jersey's self-interest at stake in the forfeiture amendment? Well, the state's self-interest is at stake. I mean, what all these cases say, and they uniformly say that when the state is a party to the contract, every case says when the state is a party to the contract, you have to apply strict scrutiny. Sometimes a party, you know, sometimes there can be a nominal party to a contract. Really, the state's not obligated to make any payment here. I think it is important for me to understand how the state's self-interest is at stake here. Okay, so it is not a signatory. It's the SEA. It's the authority. The authority is not the state. The authority is the state. It is. For purposes of constitutional analysis. So when you pay, when you give money to the authority, that goes into the general treasury of New Jersey. Ultimately, the general treasury of New Jersey supports the budget of NGSEA. NGSEA ran a deficit for several years, and the legislature appropriated monies to make it whole. Well, then they're not the same. Because if they were the same, because you wouldn't need to make an appropriation. The test of whether an agency is the state is set forth in many cases, not just contract clause cases, including the Sprout case versus West Indies that Judge Schwartz was on. And the court there said, we're not going to let the corporate form govern what the determination is. And the real test is control. And here, the authority is controlled by the state of New Jersey. The board is appointed by the governor and can be removed. The governor has to approve and veto all the authority's actions. Here, the governor directed the sale of the authority tracts. So they're one and the same for purposes of contract clause issues. In terms of the interest, the interest is several-fold. First, the contract, it is a business arrangement. It is a financial arrangement. The parties agreed that instead of what they could have done is they could have all shared an interest in the 15 OTWs and split the income and the expenses and the revenues. But what they decided to do was to allocate the OTWs so that each party would be entitled to the exclusive right to the revenues, the expenses, and the income. They would basically be on their own. So in that case, there was a trade of interests there. So they are financially interested. There are many other aspects of the contract that are financial. There's payment for simulcast signals between the parties and the like. The second way they're self-interested in, in the forfeiture amendment, is that the forfeiture amendment via the sale-lease exception allows the state, and this was in the governor's conditional veto message, this was the only reason why this bill passed is they put this exception in to allow the authority to evade the forfeiture so that they wouldn't lose their OTWs. They'd be able to keep their OTWs and use those in the transaction where they would lease the racetracks. So that's a direct financial interest in both the contract and in the statute. Mr. Meyer, let me ask you about the nature of this business because it's such a heavily regulated business. Your clients got, I guess you could call it a concession from the state, and why isn't it sort of the state giveth, the state taketh away? Surely it was to be expected that there would be continued legislation or regulation in this area. Not the legislation that we got. There was no expectation that there would be deadlines to open OTWs, which the contract said there would not be, that there would be making progress requirements, or that we would be subject to forfeiture of our rights. The contract, there was no expectation of regulation for three reasons. First, the Off-Tracking Account Measuring Act, which directed that the statute be entered, said we're not going to regulate the contract itself.  And the definition of participation agreement says we want you to work out the establishment and implementation of OTWs. So that's this variation. But that presupposes there's some activity toward that end, and there wasn't any. There was activity. At the time of the forfeiture amendment, three of the OTWs were opened. And when OTAWA was passed, there were no time deadlines, there were no minimum required. So is there no argument that your clients could have just done nothing for 39 years, and to the extent the state tried to goad them into action in year 32, that that would impair your contract? Hypothetically, they could have opened none. That's not what happened. And then the legislature would have had the ability to either issue legislation that was not a substantial impairment and didn't violate the contract clause, or could have complied with the contract clause and met the necessity and reasonableness requirements and enacted legislation that didn't violate the contract clause. When you chose to go forward, it was the SEA that had to vet the applications, right? The SEA played a regulatory role when you did choose to go forward, right? No, the SEC played a role. Oh, that chose to vet the applications? Yes. The Sports and Exposition Authority had submitted the license applications. Right. And they had to deem it to be in the – I forget the exact language. It had to be in the public interest. That's the Racing Commission. That's not the authority. That's the commission. Yes, the authority, and the statute says this in the preliminaries of the statute, it says the authority is acting in a business capacity and it's private business interest in entering into this contract. So the contract itself is not regulated. What if the commission had said, let's assume the inverse. Let's assume that your clients quickly tried to get all the licenses filled out and the commission said no, we're not ready for whatever reason. It's not in the public interest at this time. You have the same contracts clause argument? It depends when. There was a restriction that in the first two years you couldn't open more than eight. Well, let's say it was eight in the first two years, that you did all the paperwork, you got it going, and then the commission just said, no, we're not ready. I mean, I think if the commission rejected the applications, we would have some appellate grounds. Under the contracts clause? No, the contracts clause that we have today is actually addressing the statute, which is the forfeiture amendment. That's exactly my point, which is it would strike me as a little odd to say that you don't have an argument. I don't think we have a contracts clause argument there. Let me just finish. Sure. Because I want to make sure we're on the same page. If the commission had stopped you from doing what you wanted to do, I don't see a contracts clause argument there. But yet, if the legislature of New Jersey does what it did, you are making a contracts clause argument. What I'm trying to get my mind around is, why would you be on a stronger footing vis-à-vis the contracts clause when the legislature has actually followed the state constitutional procedure and done what it did as opposed to when some commission, which is arguably less formal, would have taken a similar action. You see what I'm getting at? It just seems incongruous. You're saying the commission wouldn't allow the facilities that we want to develop to go forward, and they would have been doing that under a different scenario, right? They would have been doing it under the authority to, you still have to get a license to open these things, and there are certain requirements and hoops you have to jump through. Right. The only reason for denial of the license would be that we didn't satisfy the administrative requirements, which are somewhat ministerial in terms of their implementation. But I thought some of those were open-ended. Isn't there a public interest language? I don't have it right in front of me right now. Interest of racing. Interest of racing. I mean, that's pretty nebulous. So I'm trying to get my arms around how strong your right is, I guess, in this heavily regulated field where your clients were given these concessions, but those concessions were subject to such traditional language like in the interest of racing. I do have an answer to your question. If we were denied any individual application for a license for an individual OTW, we would lose our OTW right, okay? We would go back, we would regroup, we would say, okay, we're going to file another application, maybe for a different location, but we still would have the right. And then five years later, they say, no, it's still not in the interest of racing. And then you come back year after year after year for 40 years, and they just keep saying, no, we're not interested. Right. I wouldn't expect a racing commission. They're very reputable. I wouldn't expect them to do that. But if we fail to meet the requirements of the license and they deny it, we have to deal with that. The statement that they're reputable, it sort of insinuates that what the New Jersey legislature is doing here is disreputable when on the record as I've read it, they're just trying to get this thing moving in some way because nothing had happened for a number of years. What's disreputable about that? I didn't assert that the legislature was acting disreputably. No, I know you didn't. The implication of what you said is, well, if the racing commission shut us down, you'd trust it because they're reputable. But the racing commission would be addressing an individual license application. The racing commission wouldn't be saying, we're going to take your contract rights, your valuable property rights, and we're going to turn them over. That's what I'm getting at, how valuable were those contract rights when the racing commission could have at any time for interest of racing just said, no, we're not giving you the license. They're still very valuable, Your Honor. We would continue to make applications, and if we felt that the racing commission denied our license application for an arbitrary reason. They're so valuable you haven't executed on them and you haven't sold them. You're just sitting on them. They're more valuable parked in the garage? They are, Your Honor. It's a 40-year agreement. This is a declining industry, but there may be opportunities down the road to open these things in a manner that is profitable. And just because there isn't, that's why the agreement is so long. That's why the authority as well, the authority voluntarily agreed to these terms, not just to protect us, but also protect itself. The authority had the vast bulk of these things and only opened one of nine of them. Anything else? We'll hear you on rebuttal. Thank you, Mr. Meyer. Mr. Feinblatt. Good morning, Your Honors. I think it's important to first point out that we're dealing with a statute. The one that we've discussed is the Forfeiture Amendment, which the state of New Jersey and the legislature view as a reasonable effort by the legislator to expedite the development of OTWs in New Jersey. We must start out with the point, why were they established in the first place? And it's clear from the enabling legislation, and I quote, it was the intent of the legislature by authorizing off-track wagering and cow wagering to promote the economic future of the horse racing industry in this state. It was clear from day one that it was the view of the legislature that it was needed to develop additional locations and opportunities for horse racing or betting on horses to support the industry, which everybody agrees was suffering financially. So they set forth the statute, and it must be said that my client, who was sued the Racing Commission, not the Sports and Exposition Authority, has regulated that in the most benign fashion here. They set benchmarks which did not require a showing that you had developed additional OTWs, only that you would identify the location for such a possible thing, and were taking steps to acquire that property. In fact, the appellants here were shown to have made those minimal showings, and no time have they had any of their undeveloped OTWs taken away from them. This sounds like an argument that it's a moot point about the Forfeiture Amendment. Well, it's close to being moot. So you're comfortable with our opinion making clear that the Forfeiture Amendment can't be used in any sort of adverse fashion against the appellants here? No, we admit that it's still in place, although the benchmarks that were set by the Racing Commission say they're not in effect right now. They are developing new ones. The issue, of course, their main argument is the Contract Clause violation, and has been discussed here. The key issue is, what is the standard of review? Is it strict scrutiny or not? We all understand, if it's not strict scrutiny, extreme deference must be given to the legislature. We all know there is a reasonable purpose for this legislature. Now, if we find that the state, through the Sports and Exposition Authority, is party to the contract, is strict scrutiny then necessarily required? Absolutely not. Let's look at what's going on here. Who is the state for purpose of this case? Who was sued in this case? Was the Sports and Exposition Authority sued? No. They were party to the participation agreement. The appellants have no legal right with them, because they were effectively acting in that case as a proprietary holder of OTW permits, just like the appellants. They were subject to strict regulatory review by the Racing Commission, just like the appellants. They were sued because they did not walk away from any alleged contractual obligations. The state of New Jersey, in the form of the Racing Commission, was sued because they decided to enforce, in a very benevolent way, the Forfeiture Amendment, the so-called Forfeiture Amendment. We're looking at a contract, and the parties to the contract are the plaintiffs and the NJSEA. Yes. So we have to look and see whether that contract was, among other things, was the state a party or a beneficiary of that contract? Now, we think that the issue is, as the trial judge said, it's not really whether they're a party to the contract. That may be where the real issue is, was the state self-interested? I think my second point was, were they a beneficiary? No, they were not. The state was not a beneficiary of this contract in any way. Its instrumentality was a party to the contract. How could it not have been a beneficiary of it? But they're not suing over anything that these claimants were suing? The question isn't who's the party to the lawsuit. The question is, who's the party to the contract? Well, I think, respectfully, that the real issue is, who's the party to the lawsuit? Because the question is, they're challenging what the state of New Jersey has done, and effectively what the legislature did by enforcement through the Racing Commission. Let's give you an example. So they're suing the wrong party? Is that what your position is? No. Well, they didn't know. They sued the correct party because they have no gripe with the Sports and Exposition Authority. They were simply acting as a permit holder like they were. The issue is, let's compare this case, for example, to the Virgin Islands case that was decided two years ago in 2016. Allied Industrial Service Workers International Union v. Government of Virgin Islands, 8-42-3-201. What happened there? That's a case of classic state self-interest. Virgin Islands, the government, had entered into collective bargaining agreements with government workers. They negotiated wages and done some bargaining to get to the employees. They stated the government employees had given up certain benefits in turn for a certain level of wages. They knew at the time that the financial conditions of the islands were difficult. They set up an arrangement. Years later, what did the Virgin Islands do? They said, we're reducing your salaries in this collective bargaining agreement by 8%. This court said, you know, normally we give extreme deference to what the legislature does. We can't do that here because the state self-interest is at stake. You're trying to reduce your contractual obligations under this agreement. That's not what's happening. There are no contractual obligations of the state of New Jersey, per se. But their argument is that the favorable treatment of the SEA and the forfeiture amendment redounds to the financial benefit of the state. Yes. There is no favorable treatment to the SEA in the participation agreement. No, the forfeiture amendment is illusory. I'm sorry. In the forfeiture amendment. The obligation, the requirements were applied across the board to all parties to the participation agreement. The appellants had the same ability, if they wanted to, to pursue a sale and lease-back arrangement if they wanted to. They say that was illusory. What do you say to that? I don't know, because they could have done that. They may have gotten a valuable amount for selling or leasing that arrangement, better than leaving it fallow, which of course is what this case is all about. Right, but their argument, it almost seems like an equal protection argument, but as I understand their argument, they're saying that the SEA has a lot more licenses at its disposal, potentially, and it has let them lay fallow, and why are you treating the private parties differently than you're treating the SEA? Is there some validity on a sort of accurate sense to that argument? I would say no, because they were all entitled to that option of sale and lease-back, but they were also given the option of making a showing of progress, which all were shown to do, and therefore, no rights in any form were taken away from the appellants. So if the NJSEA has its pool of licenses and chose not to make showing or make progress, is it subject to forfeiting a license? Absolutely, they all are. The same requirements apply. So your position is that we should not apply stricter scrutiny, because the state of New Jersey has no self-interest in this contract? Not in the way that you see in the cases. Let's talk about the U.S. Trust case, which is another classic case. In that case, we're dealing with the Port Authority of New York and New Jersey. They had a statutory, they entered into bonds with bondholders, where they limited their ability to invade the revenues and reserves of the Port Authority to deal with their operations. They did that because they did not want to impair the security, the financial strength of those bonds. Sure, but what's the purpose of this legislation? The state of New Jersey, the group of legislature, the governor signs the bill into law and says, we want to do this because we want to enhance an industry, a regulated industry in our state, because it's got economic value. So isn't that a demonstration of the state's interest? It's in a broad way, but that's what you could say with any legislation. All legislation is designed to promote the state interest. But here we have a state actor who's a party to the contract. Right, but they're not being sued. They're not involved in this. If we take the position that any statute promotes public policy, which it does. We don't pass statutes otherwise. If it's the position that to enforce that statute promotes self-interest, then every statute could be subject to the contract clause violation. But this legislation impacts a contract in which the state of New Jersey's instrumentality is a party. It's an instrumentality. It's a hybrid entity. We've argued that it has certain aspects that are public and private. For purposes of this legislation, if you look at the legislation and the regulation, they are acting in a private capacity. They are subject to the same heavy regulatory requirements as the two private entities. They have no different standing. Are you saying that you only win this argument if we conclude the state is not an entity? No. We would say that even if there was some less deference given, this represents a very reasonable measured effort to promote the development of the OTWs. That's the state interest involved. That's the public interest involved. I didn't see anything in the district court's opinion that addressed the question of whether the forfeiture amendment was necessary. The test, as I understand it, is if we're using heightened scrutiny, necessary and reasonable. Do we need to send it back for the district judge to decide? Not at all. Obviously, we don't think that that heightened scrutiny should apply. The standard that was applied by the court, and I think there's some ambiguity in the case law as to whether the necessity verbiage is needed, and we quoted a couple of cases such as the New Jersey Retail Merchants Association case, one of the Third Circuit cases, 669-333 at 386. And the court said when we get to that standard, that part of the test, you must ascertain whether the adjustments of the rights of the parties in the contractual relationship was reasonable and appropriate in light of that purpose. They didn't use necessity verbiage. And that's what the court did, and we think it's certainly reasonable and appropriate, even if the court were not to apply the most deferential standard. However, it's our position that if you read Judge Shipp's opinion, particularly his reconsideration opinion, it's clearly implicit that he looked at the issue of necessity, and he felt that the legislature acted appropriately in a necessary way, looking at the time frame here. This had been passed, the off-track wagering in 2002. The participation agreement had been entered in September 2003. By the time that the legislature started looking at this in 2002 and 2011, only three had been developed. It seems like it's a business that's in rough shape. It is a business, and that's why this is passed. But if it's a business that's in rough shape, why isn't it correct for Mr. Minor to argue that, you know, we had 40 years because the people that put this agreement together recognized that it's a tough industry, it's not working very well, and it might take a long time. You know, we may need some breakthrough in the year 2029 before all these licenses get acted upon when the economic conditions are such that it makes sense to do that. Well, I think that's totally inconsistent with the whole purpose of the statute. The statute was passed to develop a new form of wagering locations with the idea that it was needed to promote the development of sports racing betting. If the thought was that you were going to get these rights and then they decided to provide for geographical exclusivity, that the legislature's thought was we're going to give you these valuable rights, you could rack them up however you want around the state, and you could just sit on them and not develop them. That is just completely inconsistent with the purpose. It makes sense, but for the fact that they put a 40-year term in the agreement. If there was no 40-year term in the agreement, the court would have to infer a reasonable time. A reasonable time might be one year, three years, five years. It sure wouldn't be 40 years. But here the agreement says 40 years. Who did that? They did that privately. And it's our position that this is all subject to the intense, as Your Honor has pointed out in the earlier questioning, to careful regulatory control by the state of New Jersey and the Regulatory Commission, Racing Commission. So the state had no say in setting the 40-year term? What's that? The state had no say in setting the 40-year term? They said that, but it's our position that the say was from the outset. We did not specify the amount of time in which to establish the OTWs, admittedly. In fact, though, there was a provision that said the first two years don't develop more than eight. And I think the concern there was that there would be a rush to develop them, which would overwhelm the regulatory system, and we'd want to see how well those would be developing. Obviously, that was a false worry because, in fact, they sat on their rights. They sat on these valuable OTW opportunities. Why was forfeiture necessary as opposed to incentives or something else? This was a decision of the legislature, and we think it's entirely deference. They thought that would be the best way to promote the development of the OTWs. But I'm asking why. Like, why is it necessary? Is it because after cajoling and conversation, it was the best that could be done to try to move the program forward? I think they made an analysis and said this is a very reasonable way to promote this, and it was enforced in a very benevolent, fair way in this case. Thank you. We hope that this decision will be affirmed on appeal. Thank you. Thank you, Mr. Feinbrun. We'll hear Mr. Meyer on rebuttal. Mr. Meyer, we'll give you a chance to say your piece, but I want to direct you first to something that's concerning me. In terms of how the state interest is defined, could you address our decision in the Nieves case, which is a different Virgin Islands case? I can give you some background on that. I do know the case, Your Honor. That was not a strict scrutiny case by my recollection. Right. And why doesn't that mean here, if we follow Nieves, we must? In Nieves' case, the state was not a party to the contract. That's why a more deferential standard was applied, although not complete deference. Okay. So the line of demarcation is here the state was a party to the contract. Yes, Your Honor. All right. Then why don't you address Mr. Feinblatt's argument that the state was acting as a market participant, the SEA was a party to the contract in a very similar way as your clients? Yes. The fact that the state, and this is actually a statement that's in this court's Krishna case that we cited in our brief, which dealt with whether there was state action for First Amendment purposes against the authority, where the state had argued that that should be subject to First Amendment, and the court said the fact that they're acting in a proprietary capacity doesn't remove them from the ambit of the constitutional limitations on state activity. And, in fact, if you look at the cases, in many cases, you would expect that the state would be engaging in proprietary activities in its contracts. That doesn't mean that the contract clause doesn't apply. In fact, in the Energy Reserves case, I think that both parties cited that the court said that when a state enters into a market, that that is when the contract clause applies. How does the pilot program impair your contractual rights? The pilot program act was an impairment because of the diminution in the market share. When these parties got together, they got together to divvy up the entire statewide market, which was 15, and gave my clients a certain share of that market. And then they gave one party the lessee of the authority OTW to write to turn one of those OTWs into an additional 12 wagering facilities, which is in complete conflict with what's provided for in the contract. But the way the market was divided up was a geographical division, so this didn't really affect that. But they went hand-in-hand. I mean, if my clients had known that one of the OTWs in the northern part of the state would have been it. Is there any evidence of that? I mean, is there evidence that shows they went hand-in-hand? Yes, it says it in the contract. It says it in consideration. In consideration for dividing up the geography? We're going to give you X number of licenses and Y number of licenses? That's correct. And so your position is that that construction… That was the consideration in the contract, that we'd be giving up a share of all the OTWs throughout the state in exchange… You should have exclusivity in your geography. Correct. You know where the tracks are located. Thank you. That was the deal. Your Honor, I'm out of time, but… Go ahead. Okay. So I'll take them in reverse order. One of the final things that Mr. Feinblatt stated was that necessity was implicitly covered in the district court's decision. It absolutely was not. There's one paragraph on the third prong of the contract clause. It talks only about reasonableness. Reasonableness and necessity are two distinct requirements under all the case law. They have two distinct tests. And so necessity was not discussed or applied, and certainly not under the strict scrutiny test. Prior to that, Mr. Feinblatt talked about the legislation being reasonable. I would submit it's not reasonable under any standard, that if you look at what happens when these rights are forfeited, at the end of the day there's no guarantee that any more OTWs get opened. If my clients forfeit them, they go to the horseman's organization. If the horseman's organization doesn't open them, and we don't get paid for that, by the way, if the horseman's organization doesn't open them, they get bid out by the Racing Commission to what they call a well-suited entity. And then there's some monies that come in, but they don't come to us. But the well-suited entity, there's no requirement in the statute that they meet any deadlines or that they make progress or that they're subject to forfeiture. Did you have to put up any money to get the privilege of having this geographic interest? The exchange was for the rights in all the OTWs, as I explained before. But there was no dollar exchange? Your client didn't put out money? There was not a dollar exchange. Thank you. Go ahead. So at the end of the day, this statute doesn't guarantee that any more OTWs are going to be opened. And as I mentioned in my initial argument, by carving out the eight OTWs, the party that holds the majority of shares, you're also not providing for additional OTWs by letting the authority off the hook with the sale-lease exemption. And at the end of the day, the Racing Commission felt that it had to stay these requirements. And if it didn't stay them in 2014, eight of the OTWs would have been forfeited, including ones that have subsequently been in the process to be opened. So it would have contravened their intent. Stepping back further, Mr. Feinlein indicated basically that, no, you don't need to worry about whether the state was a contract party. All you need to do is look at self-interest. Well, that's not what the case law says. The case law says if you're a party to the contract, you are self-interested by definition of being on the contract. In the Lipscomb case, which is a Fifth Circuit case, but one of the cases that the appellees cited, the court is, when the state is a party to the contracts, the court cannot defer to the state because the state's self-interest as a party is implicated. So you always have an interest in your own contracts. And the legislature here has an opportunity to impair that contract. You don't need to look at that secondary issue of whether there's some other self-interest outside the contract unless the state was not a party to the contract. And we don't really have that issue here. And then just the last thing that I'll respond to is the suggestion that this making progress requirement is some mild requirement that's easy to meet and is not burdensome. I mean, that is absolutely not accurate. You know, in the initial making progress requirement, you have to show that you have a suitable location, you've reached a tax agreement with the municipality, and there are certain other showings that are made. But assuming you make that showing, each year you have to make annual progress. And the annual progress requirements, which are in the rules that have been stated by the commission in 13.74-2.4B, in that annual making progress requirement, you have to apply for a license, you have to either have a fee title to the property or a long-term lease where you're going to build it. You have to have financing. You have to have the money escrowed or have an irrevocable letter of credit from the bank. You have to have a project development plan by a third-party professional. You have to have all your key employees identified. And then you have to open the thing in six months. And then it applies again to the next year and again to the next year. So this implication that making progress is some benign requirement is not. Making progress is just as contract-impairing as the other requirements of the Fort Betrayal. Let me just ask you one quick question about that. If we rule against you on the Forfeiture Amendment, what happens as a practical matter in that regard over the next 6-12 months? So some of that depends on what the Racing Commission does. Currently, the Racing Commission rule that I just cited to you is stayed. However, this stays a little different than the earlier stay. The earlier stay said we're going to keep this in place until the district court rules. Then the district court ruled. The more recent stay says, well, our benchmarks that we're using to measure whether we make progress, they've expired, so we need to re-adopt them. So the most recent stay directed, and there's a link in Appellee's Brief to that order, but that said that we're going to direct the staff to begin developing regulations to develop enforceable regulations as soon as possible. So it depends on what's in those regulations. Okay, thank you for that. That's a very helpful answer. So then there's really no statutory disability that could happen prospectively, but there is a regulatory bogeyman out there that you're facing if this case doesn't go your way, depending upon what those regulations look like and whether your clients can comply with the regulations. Right now, the only thing that's standing between us and the statutory forfeiture is the administrative forbearance. The stay? Yes, and they can remove that, and depending on what they do, they can impose potentially more lengthy making progress. And we submit we're still impaired by the fact that we have to make progress and we're subject to all these deadlines. But as far as the forfeiture, you know, when that would occur will depend on what's in those benchmark regulations. That are forthcoming in theory. Yes, that the commission has said are forthcoming. Okay. Thank you, Mr. Meyer. Thank you, Your Honors. Thank you, Mr. Feinblatt. The Court appreciates counsel's argument. We'll take the matter under advisement.